**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WAEL ELKHOLY, M.D. *et al.*,<br><br>Defendants. | Civil Action No. 21-16255 (MAS) (DEA)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on a Motion to Dismiss the Complaint by Defendants Precision Pain & Spine Institute, LLC ("Precision Pain"), Precision Spine & Sports Medicine of New Jersey, LLC ("Precision Spine"), Precision Anesthesia Associates, PC ("Precision Anesthesia"), Wael Elkholy, M.D. ("Elkholy"), Ashraf Sakr, M.D. ("Sakr"), Fouad Karam, D.C. ("Karam"), Luis Ramirez-Pacheco, M.D. ("Ramirez-Pacheco"), Lydia Shajenko, M.D. ("Shajenko"), Stuart Atkin, M.D. ("Atkin"), Mehrdad Langroudi, M.D. ("Langroudi"), Chang Lee, M.D. ("Lee"), Khaled Morsi, M.D. ("Morsi"), and Monica Johnson, N.P. ("Johnson") (collectively, "Defendants"). (ECF No. 27.) Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "Plaintiffs" or the "Geico Entities") opposed (ECF No. 28), and Defendants replied (ECF No. 29). The Court also held oral argument on June 1, 2022. (ECF No. 41.) The Court has carefully considered the parties' submissions and, for the reasons below, the Court grants-in-part and denies-in-part Defendants' Motion.

## I.    **BACKGROUND**

This case is about the interplay between New Jersey healthcare providers and insurance companies that pay those providers for treating patients for injuries stemming from automobile accidents. It is a tale of two perspectives. As the Geico Entities see it, Defendants engaged in fraudulent conduct, overbilling, and violated the law with respect to treating those patients. According to Defendants, however, this case is about the Geico Entities' plot to accumulate settlement payments through targeted litigation that accuses healthcare professionals of fraud.

If every story needs a beginning, this one originates back in 1972, over four decades before the events underlying this suit, with the passage of the New Jersey Automobile Reparation Reform Act (the "No-Fault Law"). The next chapter unfolds in 1983, when the New Jersey Legislature passed the New Jersey Insurance Fraud Prevention Act ("IFPA"), which provides an avenue for insurance companies to seek relief against fraud. Because these two statutes are central to this case, the Court begins with a short recitation of their history before delving into the present motion.

### A.    The New Jersey No-Fault Law

The No-Fault Law mandated that "[e]very automobile liability insurance policy insuring an automobile as defined in this act against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of ownership, operation, maintenance or use of an automobile shall provide additional coverage." L. 1972, c. 203, § 3, at p. 782 (codified at N.J. Stat. Ann. 39:6A-4). The law developed from recommendations from the Automobile Insurance Study Commission (the "Commission") that sought to end New Jersey's fault-based tort system for automobile accidents. *Gambino v. Royal Globe Ins. Cos.*, 429 A.2d 1039, 1041-42 (N.J. 1981). The Commission proposed solving four main objectives in any no-fault system: (1) "prompt and efficient provision of benefits for all accident injury victims"; (2) "reduction or stabilization of the prices charged for automobile insurance"; (3) "ready

availability of insurance coverage necessary to the provision of accident benefits"; and (4) "streamlining of the judicial procedures involved in third-party claims." *Id.* at 1042 (citation omitted).

A primary objective of the No-Fault Law was "to minimize the workload placed upon the courts by enabling losses to pass into claims . . . with a minimum of judicial intermediation." *Gambino*, 429 A.2d at 1042 (citation omitted). As recounted by the New Jersey Supreme Court, the New Jersey Legislature was aware of the delays in compensation that resulted in courts frequently adjudicating fault. *See id.* at 1042-43; *Roig v. Kelsey*, 641 A.2d 248, 249 (N.J. 1994) ("[A]nother major benefit of the proposed system would be a reduction of the present court backlog." (emphasis omitted) (quoting Governor's Second Annual Message (January 11, 1972))). Accordingly,

> [i]n interpreting the statute to give full effect to the legislative intent, then, the statutory language must be read, whenever possible, to promote prompt payment to all injured persons for all of their losses. Consequently, approaches which minimize resort to the judicial process, or at least do not increase reliance upon the judiciary, are strongly to be favored.

*Gambino*, 429 A.2d at 1043 (citing, among others, *Amiano v. Ohio Casualty Ins. Co.*, 424 A.2d 1179, 1181 (N.J. 1981)). To assist in lowering the burden on courts, the No-Fault Law provides that, "Any dispute regarding the recovery of . . . benefits provided under personal injury protection coverage . . . arising out of the operation, ownership, maintenance or use of an automobile may be submitted to dispute resolution on the initiative of any party to the dispute . . . ." N.J. Stat. Ann. § 39:6A-5.1(a).

### B.     New Jersey IFPA

Enacted approximately a decade after the No-Fault Law, the IFPA provides that an "insurance company damaged as the result of a violation of any provision of this act may sue

therefor in any court of competent jurisdiction." N.J. Stat. Ann. § 17:33A–7(a). The New Jersey Legislature enacted the IFPA in part to combat rising insurance rates because of widespread fraud. *See* 25 N.J. Prac., Motor Vehicle Law and Practice § 11:29 (5th ed.). The IFPA's impetus was clear: "The purpose of this act is to confront aggressively the problem of insurance fraud in New Jersey by facilitating the detection of insurance fraud [and] eliminating the occurrence of such fraud through the development of fraud prevention programs." *Merin v. Maglaki*, 599 A.2d 1256, 1259 (1992) (quoting N.J. Stat. Ann. § 17:33A-2).

Broadly worded, a person or practitioner violates the IFPA by presenting or preparing false or misleading statements in connection with an insurance claim, or by failing to disclose the occurrence of an event that affects an individual's entitlement to insurance benefits or the amount of benefits. N.J. Stat. Ann. § 17:33A-4. An insured who prevails on an IFPA claim may seek recovery of attorney's fees and can seek treble damages. *Id.* § 17:33A-7a, 7b.

C.     **Defendants' Submission of PIP Benefit Claims**

With the statutory stage set, the present chapter of this story begins in 2016 with the founding of Precision Pain, Precision Anesthesia, and Precision Spine (collectively, the "Precision Facilities"). (Compl. ¶¶ 14, 16, 17, 18, 19, ECF No. 1.) Elkholy, Sakr, and Karam were the primary owners and members of those facilities and the other characters involved are straightforward: several New Jersey medical doctors, nurse practitioners, and other healthcare providers—Ramirez-Pacheco, Shajenko, Atkin, Langroudi, Lee, Morsi, and Johnson—who performed various medical procedures at the Precision Facilities over the years. (*Id.* ¶¶ 9-26.) These medical procedures included patient examinations, pain management injections, X-ray testing, chiropractic treatment, physical therapy treatment, and anesthesia services. (*Id.* ¶ 1.)

After the Precision Facilities opened, it began treating patients, some of whom were involved in automobile accidents. (*Id.* ¶ 2.) And among that subgroup of patients, several of them

were insured by the Geico Entities. So, under New Jersey's PIP Benefits program, Defendants submitted bills to the Geico Entities and other insurance companies directly for the medical services they provided the insured patients. (*E.g., id.* ¶ 27.) That is, prospective patients insured through the Geico Entities would visit Defendants' facilities, provide insurance paperwork to Defendants assigning their rights to PIP Benefits, and in return Defendants would treat the patients. (*See generally id.*)

To assist in facilitating this statutory scheme contemplated by the No-Fault Law, insurers are required to adopt a "decision point review plan," or a plan that gives insurers oversight and control of the payment of PIP Benefits. *See* N.J. Stat. Ann. § 11:3-4.7. That way, insurers can expedite the process and avoid issues through memorializing the precertification process, dispute procedures, and internal appeals, among other requirements. *Id.* The Geico Entities obliged and created a decision point review plan (the "Plan") that mirrored many of the requirements set by the No-Fault Law. (*See* Certification of Andrew Gimigliano ("Gimigliano Cert.") Ex. A, ECF No. 27-2.) Notably, the Plan contains a mandatory arbitration provision. (*Id.*)

Over the last five years, according to the Complaint, Defendants hatched a plot to scheme the Geico Entities and other insurance companies out of millions of dollars in PIP Benefits. (Compl. ¶¶ 1-2.) According to the Geico Entities, Defendants engaged in the following illegal conduct: (1) performed medical procedures that were not medically necessary, (2) billed for medical services that were never provided, (3) misrepresented and exaggerated the types of medical services rendered, (4) received unlawful kickbacks in exchange for patient referrals, (5) engaged in unlawful self-referrals, and (6) engaged in the unlawful practice of medicine based on the healthcare providers' corporate structure. (*Id.* ¶¶ 1-2, 88-446 (referencing Compl. Exs. 1 & 2).) The Geico Entities contend that they discovered the illegal conduct in 2021 then filed suit before

this Court. (*Id.* ¶ 454.) Through seventeen counts, they raise essentially four types of claims: (1) violation of the IFPA, (2) common law fraud, (3) violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and (4) unjust enrichment. (*See, e.g.*, *id.* ¶¶ 455-567.) Ultimately, the Geico Entities seek $3.3 million in recovery for payments made on more than 20,000 of Defendants' allegedly fraudulent PIP claims, punitive damages, treble damages, costs, and attorney's fees. (*Id.* ¶¶ 455-567; Defs.' Moving Br. 3, ECF No. 27-1.) Additionally, the Geico Entities seek a declaratory judgment that Defendants did not comply with all substantial laws and regulations related to the provision of healthcare in New Jersey. (Compl. ¶¶ 455-58.)

Defendants move the Court for dismissal of all counts under Federal Rules of Civil Procedure 12(b)(1) and (b)(6).[1] (Defs.' Moving Br. 15, 23.) In part, Defendants move the Court to dismiss these claims in favor of arbitration. (*Id.* at 15.)

## II.   **LEGAL STANDARD**

### A.   **Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6)**

Defendants move to dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). "When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first, because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *Dickerson v. Bank of Am., N.A.*, No. 12-3922, 2013 WL 1163483, at *1 (D.N.J. Mar. 19, 2013) (citing *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993)).

At any time, a defendant may move to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1), (h)(3). The Court may treat a party's motion

---

[1] Hereafter, references to "Rule" or "Rules" refers to the Federal Rules of Civil Procedure.

as either a facial or factual challenge to the court's jurisdiction. *Dickerson*, 2013 WL 1163483, at *1. Typically, "[a] motion to dismiss . . . for lack of subject matter jurisdiction made prior to the filing of the defendant's answer is a facial challenge to the complaint." *Bennett v. Atl. City*, 288 F. Supp. 2d 675, 678 (D.N.J. 2003) (citations omitted). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'" *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). As such, district courts "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's claim must be facially plausible to survive dismissal, such that the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B.      Motion to Compel Arbitration**

The Federal Arbitration Act ("FAA") dictates that written arbitration agreements entered into in connection with "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

of any contract. . . ." 9 U.S.C. § 2. When parties seek to enforce an arbitration agreement, they may request from the court "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Accordingly, the FAA grants courts the power to compel arbitration and to stay or dismiss claims subject to a valid arbitration agreement. 9 U.S.C. § 3. Specifically, the FAA "mandates that district courts shall direct the parties to proceed to arbitration on issues . . . to which an arbitration agreement" applies. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). This mandate that courts "rigorously enforce agreements to arbitrate" stems from the legislative intent which drove the enactment of the FAA; specifically, Congress enacted the FAA to establish a strong federal policy in support of private arbitration agreements. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (quoting *Dean Whitter Reynolds, Inc.*, 470 U.S. at 221).

Before reaching the question of whether to compel arbitration, courts must first decide whether to apply the Rule 12(b)(6) or Rule 56 standard of review. *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015). If the face of the complaint and documents relied on in the complaint clearly demonstrate that the parties agreed to an enforceable arbitration clause, the Court will apply a "Rule 12(b)(6) standard without discovery's delay." *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, L.L.C. v. United Capital Lenders, L.L.C.*, 832 F.Supp.2d 474, 482 (E.D. Pa. 2011)). But the 12(b)(6) standard should not be employed where the complaint is insufficiently clear to establish an enforceable agreement to arbitrate or where the opposing party has "come forth with reliable evidence . . . that it did not intend to be bound by the arbitration agreement." *Id.* at 774 (quoting *ParKnit Mills v. Sockbridge Fabrics Co.*, 636 F.2d 51, 55 (3d Cir. 1980)).

### C.      Heightened Pleading Standard Under Rule 9(b)

Where pleading fraud, the plaintiff "must meet a heightened pleading standard under [Rule] 9(b)." *Zuniga v. Am. Home Mortg.*, No 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). But plaintiffs "need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 658 (3d Cir. 1998) (quoting *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)).

### III.   **DISCUSSION**

Defendants raise two arguments in support of dismissal of the Complaint: (1) the Geico Entities' claims are subject to arbitration and (2) the Geico Entities fail to state a claim. The Court begins with whether arbitration is mandated, which directly impacts the Court's jurisdiction to hear the matter. The Court then addresses Defendants' remaining arguments.

### A.      Arbitrability

According to Defendants, the Geico Entities' claims fall within the gambit of the No-Fault Law's arbitration mandate. (Defs.' Moving Br. 16.) Specifically, the arbitration provision states as follows: "dispute[s] regarding the recovery of [PIP] benefits . . . arising out of the operation, ownership, maintenance, or use of an automobile may be submitted to dispute resolution on the initiative of any party to the dispute." N.J. Stat. Ann. § 39:6A-5.1(a). In Defendants' view, the

Geico Entities' claims, no matter how they are cloaked in this lawsuit, amount to "disputes regarding the recovery of [PIP] benefits," which must be arbitrated. (Defs.' Moving Br. 16.) Alternatively, Defendants aver that the Geico Entities' Plan compels arbitration for all claims in the Complaint. (*Id.* at 17.)

In response, the Geico Entities counter that fraud-based claims seeking compensatory damages for *already-paid* fraudulent PIP Benefits, including their common law fraud, RICO, and unjust enrichment claims, are not subject to the No-Fault Law's PIP arbitration mandate. (*See* Pls.' Opp'n Br. 7-12, ECF No. 28.) With respect to their IFPA claim, the Geico Entities highlight that the statutory language underlying this claim expressly provides it may be brought in a "court of competent jurisdiction" in arguing for immunity from PIP arbitration. (*Id.* at 8.)

The Court is left, then, with two different statutory constructs that may require opposite adjudicatory regimes. But the question before the Court is not whether all or none of the claims are arbitrable—instead, examination of each individual claim is required. *Gov't Emps. Ins. Co. v. Stelton Radiology Corp.*, No. 20-18532, 2022 WL 1486116, at *7-8 (D.N.J. May 11, 2022) (examining whether each individual claim must be dismissed for arbitration). Because the Geico Entities' RICO, common law fraud, and unjust enrichment claims touch only upon New Jersey's No-Fault Law and, potentially, the Plan's arbitration provision, the Court starts its analysis there. The Court next treads into the Geico Entities' IFPA claim, which is also governed by its own statutory requirements. It is this second claim that requires the Court to determine whether the two statutes are applicable and congruous.

### 1.     The Common Law Fraud, Unjust Enrichment, and RICO Claims

Defendants raise two theories as to why the Geico Entities' non-IFPA claims—that is, the RICO, common law fraud, and unjust enrichment claims—require arbitration. *First*, the No-Fault Law ensnares these claims and *second*, Geico's Plan mandates arbitration.

a.      **The No-Fault Law's Arbitration Requirement**

To start, the Court looks to the No-Fault Law's plain language. It provides that, "[a]ny *dispute regarding the recovery of . . . benefits* provided under *personal injury protection* coverage . . . arising out of the operation, ownership, maintenance or use of an automobile *may be submitted to dispute resolution on the initiative of any party* to the dispute . . . ." N.J. Stat. Ann. § 39:6A-5.1(a) (emphases added). The term "any dispute" is straightforward enough: it means *all* "disputes" around the "recovery" of PIP Benefits are controlled under this provision. *See id.* Further, in the context of an arbitration provision, the term "dispute" refers to legal disputes between parties. *See id.* And in defining the term "recovery" in the context of this statute, the policy behind the No-Fault Law suggests that recovery means claims for PIP Benefits submitted by insured individuals or their medical providers to insurance companies. *See id.* The language of the statute leads to one conclusion: the arbitration mandate covers a broad array of legal disputes. *See State Farm Mut. Auto. Ins. Co. v. Molino*, 674 A.2d 189, 190 (N.J. Super. Ct. App. Div. 1996) (emphasizing that "the word 'dispute' is unqualified"). Further, the statute is equally clear as to who may invoke arbitration—"any party to the dispute." N.J. Stat. Ann. § 39:6A-5.1(a).

The Court next moves to the purpose behind the No-Fault Law. That is, motivating the No-Fault Law's arbitration provision is a "firm policy favoring prompt and efficient resolution of PIP disputes without resort to the judicial process." *Molino*, 674 A.2d at 191; *see also Roig*, 641 A.2d at 256 (explaining that one of "the overwhelming goals" of the No-Fault Law is reducing court congestion). It should follow, then, that the No-Fault Law encompasses a broad array of legal disputes regarding PIP benefits, including mistaken claims for benefits, fraud-based claims, or any other claim involving the "recovery" of PIP Benefits. *See Molino*, 674 A.2d at 190-91 ("Clearly, to ensure the viability of arbitration as a forum for the resolution of PIP disputes is to foster the[] [aforementioned] goal[]."). Moreover, should the parties' characterization of a PIP Benefits

11

dispute be dispositive, a party wishing to sidestep mandatory arbitration could classify their claims in ways that fling open the courthouse doors. Such an end-run around the No-Fault Law's strong policy purpose of "prompt and efficient resolution of PIP disputes without resort to the judicial process" would be consequential, to say the least. (*Id.* at 191).

Applying the plain meaning of the No-Fault Law's arbitration provision to the case at bar, the Court finds that the Geico Entities' common law fraud, unjust enrichment, and RICO claims fall within the purview of the statute's arbitration provision. At bottom, these claims involve (1) a dispute by the Geico Entities (2) involving Defendants' recovery of PIP Benefits that (3) one party wishes to send to arbitration. Notwithstanding that the Geico Entities seek to dress their PIP Benefits dispute in a different color sounding in fraud, the Court adheres to substance over form. Nothing in the statute provides that fraud-based claims warrant special treatment or should be carved out from mandatory arbitration, nor can the Court find any independent reason to do so.

The Court is equally unconvinced by the Geico Entities' attempt to distinguish fraudulent PIP Benefits that were already paid from those benefits that have yet to be paid. (Pls.' Opp'n Br. 7-9 (arguing that past fraud "go[es] beyond" disputes over the recovery of PIP Benefits).) Without much explanation, the Geico Entities conclude that this distinction is meaningful enough to defeat the No-Fault Law's broad policy preference for arbitration. (*See id.* at 6-7 (citing *Gov. Emp. Ins. Co. v. Reg'l Orthopedic Prof. Ass'n*, No. 17-1615, 2017 WL 5986964, at *1 (D.N.J. Dec. 1, 2017) ("Although state law requires that any dispute regarding the recovery of medical expense benefits under PIP be arbitrated, N.J. Stat. Ann. § 39:6A-5.1, GEICO's allegations *go beyond* such dispute." (emphasis added)).) Although this theory has gained some traction within this District, the Court is not eager to engraft the word "pending" before "disputes" when the legislature chose not to do so. *But see Gov. Emp. Ins. Co. v. Adams Chiropractic Ctr. P.C.*, No. 19-20633, 2020 WL

881514, at *1 n.3 (D.N.J. Feb. 24, 2020) (citing case law that only discusses IFPA claims yet concluding that "NJIFPA, RICO or common law fraud claims are not subject to mandatory arbitration under New Jersey's no-fault insurance statute"). Indeed, on the Court's own review of the cases that held all fraud-based claims extend "beyond" PIP Benefits disputes, it has yet to uncover a persuasive basis for reaching this conclusion. *See, e.g, Stelton Radiology Corp.*, 2022 WL 1486116, at *5 (noting without explanation that "courts in this district have held that RICO and other fraud claims 'go beyond' the type of PIP disputes for which arbitration is mandatory"). That is, the Court declines the invitation to blue pencil a state law statute with a qualifying adjective that the legislature "pointedly omitted in drafting." *DiProspero v. Penn*, 874 A.2d 1039, 1048 (N.J. 2005). This is particularly true where, as is the case here, "any ambiguity [of] what constitutes a 'dispute' subject to the arbitration provision . . . must be construed liberally 'to harmonize the arbitration provision with [New Jersey's] firm policy favoring prompt and efficient resolution of PIP disputes without resort to the judicial process.'" *Gov't Emps. Ins. Co. v. MLS Med. Grp. LLC*, No. 12-7281, 2013 WL 6384652, at *5 (D.N.J. Dec. 6, 2013) (quoting *Molino*, 674 A.2d at 191). Under the plain meaning of the statutory language, accordingly, the Geico Entities' common law fraud, RICO, and unjust enrichment claims do not elude the No-Fault Law's arbitration mandate.

To be sure, the No-Fault Law explicitly specifies that claims based on medical procedures not performed, those not necessary, or those ineligible for PIP Benefits *still* fall within the gambits

of the dispute resolution proceedings.[2] In fact, many of the Geico Entities' grievances mirror precisely the medical expense benefit disputes codified in the statute that an arbitrator may hear. (*Compare* Compl. ¶¶ 463-567, *with* N.J. Stat. Ann. § 39:6A-5.1(c).) It seems arbitrary to distinguish a scenario where medical providers inadvertently bill an insurance company for PIP Benefits through unnecessary or unperformed medical procedures and a scenario where they fraudulently do so. The two situations are identical but for the intent. Consequently, in comparing the No-Fault Law's language, legislative intent, application, and arbitrable claims with the Geico Entities' claims for common law fraud, RICO, and unjust enrichment, the Court finds nothing preventing an arbitrator from hearing them.

The Court therefore dismisses these counts in favor of arbitration.

**b.      The Geico Entities' Plan**

Having found the Geico Entities' RICO, common law fraud, and unjust enrichment claims arbitrable, the Court need not dwell on Defendants' second argument in support of arbitration: that

---

[2] "Dispute resolution proceedings . . . include disputes arising regarding medical expense benefits." N.J. Stat. Ann. § 39:6A-5.1(c). Medical expense benefit disputes are defined in the statute as follows:

> [d]isputes involving medical expense benefits may include, *but not necessarily be limited to*, matters concerning: (1) interpretation of the insurance contract; (2) whether the treatment or health care service which is the subject of the dispute resolution proceeding is in accordance with the provisions of [this Act] or the terms of the policy; (3) the eligibility of the treatment or service for compensation; (4) the eligibility of the provider performing the treatment or service to be compensated under the terms of the policy . . . ; (5) whether the disputed medical treatment *was actually performed*; . . . (7) the *necessity or appropriateness* of consultations by other health care providers; . . . and (9) whether the treatment performed is *reasonable, necessary, and compatible with the protocols* . . . .

*Id.* (emphases added).

the Geico Entities' Plan contains an express arbitration agreement. (Defs.' Moving Br. 17.) In any event, the Court finds arbitration required under this theory, as well.

In evaluating whether a given claim is subject to an arbitration agreement, "judicial review is limited to two threshold questions: '(1) Did the parties seeking or resisting arbitration enter into a valid arbitration agreement? (2) Does the dispute between those parties fall within the language of the arbitration agreement?'" *Stelton Radiology Corp.*, 2022 WL 1486116, at *4 (quoting *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998)).

As to the first question, the party requesting arbitration bears the burden of demonstrating the existence of an enforceable arbitration agreement that binds both parties. *Id.* at *3; *Sportelli v. Circuit City Stores, Inc.*, No. 97-5850, 1998 WL 54335, at *2 (E.D. Pa. Jan. 13, 1998). Here, neither party challenges the validity of the Plan; rather, the Geico Entities argue that a valid arbitration agreement does not exist between them and Defendants, leaving Defendants without standing to invoke the terms of the Plan's arbitration clause. (Pls.' May 25, 2022 Correspondence 2-3, ECF No. 39.) The Court disagrees and finds that the arbitration agreement is valid and binding as to both parties.

The Plan unequivocally allows insured individuals to assign PIP Benefits to healthcare providers. (Gimigliano Cert. Ex. A, at 10.) Even more on point, the Plan expressly provides that once PIP Benefits are assigned, healthcare providers have standing to invoke the arbitration provision. (*Id.* ("If there is a dispute as to any issue arising under this [Plan], or in connection with any claim for [PIP] benefits, a request for the resolution of that dispute may be made by . . . GEICO[] or a treating health care provider who has a valid Assignment of Benefits from the Insured or Insured/Eligible Insured Person.").) But the Geico Entities stress that Defendants have not come forward with evidence that they executed the formal documents for assignment of their

patients' PIP Benefits at issue here. (*See id.* at 13.) This lack of proof, the Geico Entities contend, is fatal to Defendants because without valid assignments, they are not parties to the Plan's arbitration agreement. (Pl.'s May 25, 2022 Correspondence 3.)

This argument fails. *First*, the Geico Entities raised this defense in post-briefing correspondence at the eleventh hour. *Second*, even ignoring the untimely submission, by paying Defendants the underlying PIP Benefits at issue in this suit, the Geico Entities effectively recognized the validity of the PIP assignments, and they cannot now attempt to argue otherwise. *See Premier Health Ctr., P.C. v. UnitedHealth Grp.*, No. 11-425, 2012 WL 1135608, at *8 n.3 (D.N.J. Apr. 4, 2012) ("[Plaintiffs] cannot act as though valid assignments exist through course of conduct and then challenge the assignment's very existence in litigation."); *Gregory Surgical Servs., LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.*, No. 06-0462, 2007 WL 4570323, at *3-4 (ruling that the defendant-insurer's course of conduct, which recognized the validity of the assignment of insurance benefits to plaintiff-provider, relinquished defendant-insurer's right to enforce its anti-assignment clause). What's more, the Geico Entities' Complaint provides that valid assignments of PIP Benefits are required before medical providers receive payments for those benefits. (Compl. ¶ 38.) To be sure, the Geico Entities paid Defendants for thousands of PIP claims and not once challenged the validity of any assignment. (*Id.* ¶ 1; Defs.' Moving Br. 3.) Thus, the Court finds sufficient evidence that both parties are bound by the Plan.[3]

---

[3] The Court may consider the Plan on Defendants' Motion because, although attached by Defendants in moving for dismissal, the Plan is central to the Complaint as the impetus for all the PIP Benefits at issue in this matter, and the authenticity is not contested by either party. *See Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 253 n.3 (3d Cir. 2010) ("[D]ocuments that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim." (quoting *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548 (3d Cir. 2002))).

Having determined that the parties entered into a valid arbitration agreement, the Court must next determine whether Plaintiffs' claims fall within the scope of that arbitration agreement. *John Hancock Mut. Life Ins.*, 151 F.3d at 137. It does so with ease. "New Jersey courts have read both phrases, 'arising out of' and 'in connection with,' to mandate arbitration in almost all cases." *Stelton Radiology Corp.*, 2022 WL 1486116, at *6; *Curtis v. Cellco P'ship*, 992 A.2d 795, 801-02 (N.J. Super. Ct. App. Div. 2010) (explaining that arbitration mandates for any issues "arising out of" or "in connection with" a given subject matter "have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with [that subject matter]"). Here, any disputes "arising under" the Geico Entities' Plan or "in connection with any claim for [PIP] [B]enefits" is subject to the arbitration clause. (Gimigliano Cert. Ex. A, at 10.) For the above reasons, the Geico Entities' RICO, fraud, and unjust enrichment claims are in connection with PIP Benefits and, therefore, subject to the Plan's arbitration clause.

### 2. New Jersey IFPA Claim

Up next, the Court pushes forward to determine whether the Geico Entities' IFPA claim is also subject to mandatory arbitration. (*See* Compl. ¶¶ 459-62.) Again, Defendants argue that either the No-Fault Law or, alternatively, the Geico Entities' Plan mandates arbitration. (Defs.' Moving Br. 15-20.) The Court again considers each theory in turn.

### a. The IFPA's Judicial Review Provision

In addressing the Geico Entities' IFPA claim, the Court begins with state legislative guidance that it must be construed "liberally to accomplish the Legislature's broad remedial goals" of fighting insurance fraud. *Stelton Radiology Corp.*, 2022 WL 1486116, at *8 (citation omitted). The IFPA provides that "[a]ny insurance company" damaged under the act may "sue in any court of competent jurisdiction." N.J. Stat. Ann. § 17:33A-7a. The statute is silent as to how the IFPA interacts with the No-Fault Law's PIP Benefits procedure. Putting it all together, on one hand the

No-Fault Law requires arbitration and, on the other hand, the IFPA unambiguously allows an insurance company to bring claims in any court with jurisdiction. As required by the canons of statutory interpretation, the first step is to harmonize the provisions of these two statutes, if possible. *See In re Gray-Sadler*, 753 A.2d 1101, 1111 (N.J. 2000) (explaining that when faced with conflicting statutory provisions, courts "are obligated to make every effort to harmonize them, even if they are in apparent conflict"). There remains an "assumption that the Legislature was aware of its actions and intended for cognate provisions to work together." *State ex rel. J.S.*, 998 A.2d 409, 418 (N.J. 2010); *see also State v. Gomes*, No. 20-3477, 2022 WL 2068976, at *7 (N.J. Super. Ct. App. Div. June 9, 2022) ("The Legislature is presumed to be familiar with its own enactments.").

Starting again with the plain meaning, here the IFPA, its language dictates that insurers' claims for damages under the IFPA are required to be judicially resolved. N.J. Stat. Ann. § 17:33A-7(a). Specifically, the phrase "*may* sue" prefaces the resolution of IFPA claims as allowing them "in any court of competent jurisdiction." *See id.* Further, arbitration is clearly not a court of competent jurisdiction. So, as a result, insurers' IFPA claims are filed in the judicial system and not before an arbitrator, notwithstanding that the No-Fault Laws seem to require otherwise when PIP Benefits are involved. *See Allstate N.J. Ins. Co. v. Lajara*, 117 A.3d 1221, 1232 (N.J. 2015) (ruling that, even in the context of IFPA claims involving PIP recovery disputes, the state constitutional right to a jury trial nevertheless applies); *Nationwide Mut. Fire Ins. Co. v. Fiouris*, 928 A.2d 154, 159 (N.J. Super. Ct. App. Div. 2007) ("It is clear from this provision that the Legislature did not contemplate that a claim of a violation of the [IFPA] would be heard by an arbitrator."); *Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 492 (D.N.J. 2018) ("The NJIFPA is not preempted by PIP arbitration rules.").

Additionally, courts are mindful that the IFPA was enacted later in time than the No-Fault Law, and state legislatures are presumed aware of prior enactments. *See State ex rel. J.S.*, 998 A.2d at 418. Notwithstanding the requirement that PIP Benefits disputes be arbitrated, the IFPA was enacted with no carveout or exception for such disputes. *Merin*, 599 A.2d at 1259 ("The words chosen by the legislature are deemed to have been chosen for a reason." (citing *Gabin v. Skyline Cabana Club*, 258 A.2d 6, 9 (N.J. 1969)). Indeed, by enacting the IFPA, the state legislature sought to "confront aggressively the problem of insurance fraud." *Lajara*, 117 A.3d at 1228 (quoting N.J. Stat. Ann. § 17:33A-2). In doing so, the legislature crafted a separate insurance fraud statute that is easier to prove than common law fraud. *See Meer*, 321 F. Supp. 3d at 493 ("Unlike common law fraud, proof of fraud under the IFPA does not require proof of reliance on the false statement or resultant damages, nor proof of intent to deceive." (quoting *Lincoln Nat'l Life Ins. Co. v. Schwarz*, No. 09-3361, 2010 WL 3283550, at *16 (D.N.J. Aug. 18, 2010) (internal quotation marks omitted))).

The IFPA streamlined a pathway for insurers to access the judiciary and more readily receive remedies for fraudulently submitted insurance claims. It would seem, therefore, that allowing a subset of IFPA violations to avoid judicial resolution based on an earlier-enacted statute would belie legislative intent. After all, the IFPA could have provided a carve out for PIP Benefits disputes but did not. *See DiProspero*, 874 A.2d at 1048 ("Our duty is to construe and apply the statute as enacted." (citations omitted)).

Further, a separate provision of the IFPA lends support to judicial resolution of claims arising out of the statute. In particular, the IFPA requires that insurance providers share copies of court filings with the Commissioner of Banking and Insurance; in turn, the statute empowers the state agency to intervene in lawsuits brought by insurers and seek a civil penalty against

defendants. *Fed. Ins. Co. v. von Windherburg-Cordeiro*, No. 12-2491, 2012 WL 6761877, at *4 (D.N.J. Dec. 31, 2012) (noting that "[i]t is doubtful" that Commissioner's intervention would be "appropriate in a typical arbitration proceeding," and expressing that "it does appear that state law requires [plaintiff's] claim be brought in a judicial forum"). But sending these claims to arbitration would undermine the Commissioner's ability to intervene and run contrary to the IFPA's purpose of combating common forms of insurance fraud. *See id.* at *2 ("[C]ertain remedies available under the [IFPA] are unavailable in arbitration and, as a result, . . . dismissing the action would violate New Jersey's public policy to fight insurance fraud.").

In sum, the plain language, purpose, and provisions of the IFPA demonstrate that the Geico Entities' IFPA claim must be brought before the Court. As such, the Court finds it has jurisdiction over the Complaint's IFPA claim.

### b.   The Geico Entities' Plan

In another attempt to shoehorn the Geico Entities' IFPA claim into arbitration, Defendants point to the Plan's arbitration provision for refuge. (*E.g.*, Defs.' Moving Br. 9.) Unlike the non-IFPA claims, however, there exists strong legislative intent to categorically require judicial resolution of all the IFPA claims. *See von Windherburg-Cordeiro*, 2012 WL 6761877, at *4 (explaining that despite the existence of an arbitration clause between the parties, "state law requires [Plaintiffs'] IFPA claim be brought in a judicial forum"). Thus, courts routinely uphold the IFPA's absolute mandate for judicial resolution notwithstanding contractual clauses that would otherwise require arbitration of IFPA claims. *Nationwide Mut. Fire Ins. Co. v. Fiouris*, 928 A.2d 154, 157 (N.J. Super. Ct. App. Div. 2007) ("[T]he Legislature did not contemplate that a claim of a violation of the [IFPA] would be heard by an arbitrator."); *von Windherburg-Cordeiro*, 2012 WL 6761877, at *4 ("[S]tate law requires [plaintiff]'s IFPA claim be brought in a judicial forum.").

Acknowledging the import of the Federal Arbitration Act, with an express national policy in favor of arbitration that can typically preempt contrary state law, these cases nevertheless hold that the IFPA's policy in favor of judicial resolution is controlling as to the resolution of IFPA claims. *See Meer*, 321 F. Supp. 3d at 492 (ruling that IFPA claims must be judicially resolved notwithstanding a private arbitration agreement supported by the FAA); *Stelton Radiology Corp.*, 2022 WL 1486116, at *7-8 (expressing the same). This is because, under the McCarran-Ferguson Act, state insurance regulations "reverse preempt" conflicting federal statutes when: "(1) the state statute was enacted 'for the purpose of regulating the business of insurance,' (2) the federal statute does not 'specifically relate to the business of insurance,' and (3) the federal statute would 'invalidate, impair, or supersede' the state statute." *Meer*, 321 F. Supp. 3d at 492 (quoting *Suter v. Munich Reinsurance Co.*, 223 F.3d 150, 160 (3d Cir. 2000)). With respect to the IFPA, courts in this District regularly find that the IFPA is insurance-specific, the FAA is not, "and applying the FAA . . . would 'invalidate, impair, or supersede' the IFPA." *Id.*; *see also von Windherburg Cordeiro*, 2012 WL 6761877, at *4 ("Applying these factors in this case, the Court finds that the FAA does not supersede New Jersey's law requiring [IFPA] claims to be brought in a judicial forum."). Absent the FAA forcing arbitration, the IFPA controls and mandates judicial resolution. Thus, Defendants' Motion is denied with respect to compelling arbitration of the Geico Entities' IFPA claims.

## B.    Failure to State a Claim

Although the Geico Entities raise six arguments under Rule 12(b)(6), four relate to counts already dismissed by the Court and are therefore rendered moot. (*Compare* Defs.' Moving Br. 24 (challenging IFPA claim under Rule 9(b)) and 33 (challenging declaratory judgment claim as duplicative), *with* 28 (challenging RICO and common law claims), 35 (challenging RICO claim under Rule 9(b)), 36 (challenging common law fraud claim under economic loss doctrine), and 37

(challenging unjust enrichment claim against individual defendants).) The Court therefore addresses the two remaining arguments: that the Geico Entities fail to plead their IFPA claim with the required particularity and that the declaratory judgment count is duplicative.

### 1.      Plaintiffs Plead with Sufficient Particularity

Defendants argue that the Geico Entities' IFPA claim is pled with insufficient particularity to satisfy the heightened pleading standard set forth by Rule 9(b) for fraud-based claims. (Defs.' Moving Br. 24-28.) An individual or medical provider violates the IFPA if he or she engages in any of the following conduct:

> (1) Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> (2) Prepares or makes any written or oral statement that is intended to be presented to any insurance company, the Unsatisfied Claim and Judgment Fund or any claimant thereof in connection with, or in support of or opposition to any claim for payment or other benefit pursuant to an insurance policy or the "Unsatisfied Claim and Judgment Fund Law," P.L.1952, c. 174 (C.39:6-61 et seq.), knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> (3) Conceals or knowingly fails to disclose the occurrence of an event which affects any person's initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

N.J. Stat. Ann. § 17:33A-4. In sum, the IFPA "prohibits the submission of insurance reimbursement claims when a party knows that the claim contains false or misleading information concerning any fact or thing material to the claim, and prohibits concealment or knowing failure to disclose an event that affects the eligibility for reimbursement or the amount of reimbursement." *Stelton Radiology Corp.*, 2022 WL 1486116, at *8. Here, the Geico Entities' Complaint alleges in

detail numerous claims for PIP benefits by Defendants that qualify as IFPA violations.[4] For instance, the Defendants' PIP claims for a variety of allegedly medically unnecessary services fall within the purview of the IFPA. (*See* Compl. ¶ 463.)

Relevant to Defendants' Motion, the Geico Entities allege that Defendants violated the IFPA by billing for medically unnecessary services with sufficient particularity to satisfy the requirements of Rule 9(b). Indeed, the Complaint contains paragraphs of extensive factual allegations, supported by claim-specific examples, detailing not only the types of services that were medically unnecessary but also why those services were medically unnecessary. (*See, e.g.*, Compl. ¶¶ 294-305 (detailing 20 examples of Defendants "routinely purport[ing] to provide and/or perform NCV[] [tests] on far more nerves than recommended" by an industry association in the relevant medical field).) Such examples, if proven, would demonstrate that Defendants' billing for medically unnecessary services was performed as a matter of routine, strongly indicating that Defendants knew of their fraudulent behavior when submitting their PIP claims.

Even Defendants "admit[] the Complaint here contains more 'examples'" than cases they rely on in arguing insufficient factual pleading under Rule 9(b). (Defs.' Moving Br. 26.) In an attempt to undermine Plaintiffs' IFPA claim, therefore, Defendants contend that their method of pleading, relying on representative examples, is fundamentally insufficient to satisfy the

---

[4] The Geico Entities' Complaint also describes several other methods by which Defendants' claims for PIP benefits violated the IFPA. For example, the Geico Entities assert that Defendants, in submitting and billing for the disputed PIP claims, knowingly failed to disclose that they and the "[f]raudulent [s]ervices" that they administered were not "in compliance with all significant statutory and regulatory requirements governing healthcare practice, and therefore were [in]eligible to receive PIP reimbursement." (Compl. ¶ 460(i)-(ii).) The Geico Entities alleged this IFPA violation with sufficient particularity, as the Complaint contains numerous claim-specific examples of this conduct. Further, since New Jersey law stipulates that courts must presume medical providers are aware of all governing healthcare laws, the Geico Entities sufficiently allege that Defendants knew of their failure to disclose their noncompliance with relevant laws. *See Allstate Ins. Co. v. Northfield Med. Ctr., P.C.*, 159 A.3d 412, 428 (N.J. Super. Ct. App. Div. 2017).

heightened standard imposed by Rule 9(b). (*Id.*) But the examples expounded on in the Complaint are detailed in nature and numerous in quantity, and, importantly, courts in this District found in similar cases that this methodology of pleading is sufficient to survive a motion to dismiss under Rule 9(b). *See Stelton Radiology Corp.*, 2022 WL 1486116, at *9 ("Such selected examples constitute sufficient support for the allegations; GEICO is not required to set forth the evidentiary particulars of each of the many allegedly false claims submitted in violation of the []IFPA at this . . . pleading stage.").

Ultimately, the Court finds that the Geico Entities have alleged their IFPA claim with enough particularity to satisfy the heightened pleading standard of Rule 9(b) and, accordingly, the Defendants' motion to dismiss is denied as to Count Two of the Complaint.

### 2.      Declaratory Judgment Count is Duplicative

Count One seeks a declaratory judgment against Defendants that, between 2016 and present, Defendants "were not in compliance with all significant laws and regulations governing healthcare practice." (Compl. ¶ 457.) "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). Courts may exercise that discretion and dismiss declaratory judgment claims where "claims under the Declaratory Judgment Act . . . are duplicative or redundant of other claims." *Morinville v. United States Pat. & Trademark Off.*, 442 F. Supp. 3d 286, 296 (D.D.C. 2020).

Considering the Court's retention of the Geico Entities' IFPA claim, already before the Court is whether Defendants violated the IFPA. In its discretion, then, the Court declines any invitation to make a duplicitous finding on the same issue under the guise of a declaratory judgment action. *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 379 (D.N.J. 2015); *In re Lincoln Nat'l COI Litig.*, 269 F. Supp. 3d 622, 639-40 (E.D. Pa. 2017); *AV Design Servs., LLC v.*

*Durant*, 2021 WL 1186842, at *12 (D.N.J. Mar. 30, 2021) (dismissing declaratory judgment claim where claim was "entirely duplicative of . . . breach of contract claim"). To the extent the Geico Entities seek a declaration that Defendants violated RICO, committed common law fraud, or are liable for unjust enrichment, an arbitrator shall decide that issue.

IV.   **CONCLUSION**

For the above reasons, the Court grants Defendants' Motion to Dismiss as to Plaintiffs' common law fraud, RICO, and unjust enrichment claims in favor of arbitration, but denies Defendants' Motion as to Plaintiffs' IFPA claim. The Court will issue an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE